UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Matthew J. Ryan<br>5480 Wisconsin Avenue<br>Apt. 615<br>Friendship Heights, Md. 20815<br>301-718-7868<br><br>Plaintiff,<br><br>v.<br><br>BuckleySandler, L.L.P.<br>1250 24th Street, N.W.<br>Suite 700<br>Washington, D.C. 20037<br><br>Kirk Jensen<br>18401 Broad Leaf Road<br>Boyds, Md. 20841<br><br>Elizabeth McGinn<br>7313 Venice Street<br>Falls Church, Va. 22043<br><br>Defendants. | Case: 1:13-cv-01816<br>Assigned To : Howell, Beryl A.<br>Assign. Date : 11/19/2013<br>Description: Employ. Discrimn. |

There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in this Complaint.

## COMPLAINT AND DEMAND FOR A JURY TRIAL

NOW COMES Plaintiff, Matthew J. Ryan, for his Complaint against

BuckleySandler, L.L.P. ("BuckleySandler") and states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.    Plaintiff, Matthew J. Ryan, is currently 47 years of age and a United

States citizen residing in Friendship Heights, Maryland 20815.

2.      Plaintiff is a member of the D.C. Bar. (D.C. Bar # 432707) but is not a member of the Bar of this court and is acting pro se.

3.      BuckleySandler is a law firm. It has its principal place of business at 1250 24th Street, N.W., Washington, D.C. 20037. At all times relevant to this case, BuckleySandler employed in excess of 20 employees in an industry affecting commerce. (On January 31, 2013 it employed over 100 people.) Defendants Jensen and McGinn are members of the partnership of BuckleySandler and maintain offices at 1250 24th Street, N.W., Washington, D.C. 20037.

4.      Subject matter jurisdiction over this action is based upon 28 U.S.C. § 1331 which confers jurisdiction upon this court for actions that arise under the Constitution and laws of the United States. This action presents a federal question as Plaintiff's cause of action arises under the Age Discrimination in Employment Act of 1967, as codified at 29 U.S.C. § 621 et seq.

5.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because the events giving rise to the instant claim occurred in this District.

6.      Pendent jurisdiction over Plaintiff's claims under the District of Columbia Human Rights Act, D.C. Code § 2-1401 et seq., is proper pursuant to 28 U.S.C. § 1367.

7.      On July 26, 2013, Plaintiff filed a Charge of Discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") concerning the material facts charged herein. The EEOC issued a Notice of Right to Sue letter on August 27, 2013 (see Attachment), and the instant action was timely instituted before the expiration of 90 days of Plaintiff's receipt thereof.

8.     There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in this Complaint.

## GENERAL ALLEGATIONS

9.     I was unlawfully discriminated against and my employment was terminated because of my age on January 30, 2013. I was 46 years old at that time.

10.     I began working at Buckley Kolar, LLP, the predecessor to BuckleySandler, LLP on March 3, 2008. I was working on a temporary basis as a contract attorney through a legal staffing agency.  The project on which I was working was a document review project which was expected to last four to six weeks.  It lasted thirteen and a half months. There was an initial team of five contract attorneys (including me).  A couple months later, 15-20 more contract attorneys were added. Most of them only worked on the project for a month but three stayed longer. In the second week of August 2008, the number of contract attorneys was reduced to two. I was one of the two. The project lasted until the middle of April 2009, when it abruptly ended because of the client's bankruptcy.

11.     I continued to do temporary contract work through legal staffing agencies and worked at a few other firms for the remainder of 2009. In December of 2009 I was contacted by Henry Lindsley, then a staff attorney at BuckleySandler, LLP. He stated that Kirk Jensen, a partner at BuckleySandler, had another document review project which was going to start soon and asked whether I was interested in working on it as a temporary staff attorney. I was and started the first week of January 2010.

12.     The project never became as big as anticipated. It effectively ended

after approximately two and a half months and I was transferred to another project. That project only lasted a couple weeks and then I was assigned to another project on which I spent most of the rest of the year. I did a few smaller projects the remainder of the year. I worked between 2,600 and 2,700 hours in 2010 for BuckleySandler.

13.     In September 2010, everyone who had been hired as a temporary staff attorney earlier than March 2010 had their status changed to permanent staff attorney. This was done to comply with labor laws. BuckleySandler decided that they could no longer classify employment of such tenure to be temporary. They implemented a policy that employees would not be categorized as temporary for more than six months. It was adhered to until December 2012.

14.     For me, the practical effects were: 1 – I was given health insurance, 2 – I had my mandatory hour requirement decreased from 50 to 40 per week (Actually this was theoretical. I was working over 50 and continued to work over 50.), and 3 – I now accrued vacation time (Actually this was theoretical too. I never took a vacation and a year later they changed the policy and took away all of my accrued time.)

15.     In April or May of 2010 Kirk Jensen was placed in charge of the Staff Attorney program. [In November or December of 2011 Elizabeth McGinn was made either the co-partner or assistant partner in charge of the Staff /Regulatory Attorney program. As such, she shares responsibility for the actions of Kirk Jensen unless proven otherwise.]

16.     In July of 2010 I got into trouble for coming in late. The partner in

4

charge of the project on which I was working set an attendance requirement of

arriving no later than 9:30 and leaving no earlier than 6:00. I had been arriving at

around 11:00 (and leaving at 10:30). On the day that I got in trouble, I had arrived at

1:30. The partner complained to Kirk Jensen. The next day Kirk Jensen told me that

I had to keep the required hours. And I did.

17.    In December of 2010 I had an annual performance evaluation. The

evaluation was conducted by a partner, Jonice Gray Tucker. I was on a project for

her earlier that year but it only lasted for a couple of weeks. Most of her information

for the evaluation was based upon what other partners and associates had written

about me. I was not able to read what they had written. However, from what I could

determine from Ms. Tucker's comments, the evaluations were all highly

complimentary of the quality of my work. She did mention the matter of my coming

in late. But then stated that she wanted me to join an ongoing project of hers as soon

as I was available. She said that she wouldn't have a problem with me coming in at

1:30 and didn't think that Khalid Jones (the associate overseeing the day to day

matters of the review) would either.

18.    I was assigned to Ms. Tucker's project in mid-January 2011. (However,

soon thereafter, she became less involved and the lead partner then was Elizabeth

McGinn.) The project was a review of mortgage loan files for a loan servicer. It had

started around the end of October 2010 and there were about twenty-five staff

attorneys and temporary staff attorneys on it. Until the end of June (and again in

September) we were reviewing loan files and after that we were reviewing an

activity log for each loan.

19.    The review team was divided into two levels. There was a first/initial review and a second level quality control review. I was assigned to first level review. At the time I joined the project there probably were around 20 first reviewers and slightly under 10 second reviewers (including a few associates). I did first review until June when I was moved to second review. At that time there was a more equal division.

20.    The instructions for this project were very simple: 1 – identify customer complaints, 2 – identify other problems, and 3 – identify documents subject to attorney/client privilege. Documents in the first two categories were to be marked "Key" and the reviewer was to write a description regarding the nature of the complaint or problem. Documents in the third category were to be marked "Privileged".

21.    My work was spectacular. With regard to both quality and quantity no one else even came close. In fact the volume of work that I did was several times that of anyone else. [(Note: Plaintiff has identified his former colleagues with their initials. BuckleySandler will have no problem identifying them.) I. I. did about 2/3 of the quantity that I did but his work was of unusually low quality.] And the difference in quality was even greater.

22.    The rest of the team was fairly good at identifying customer complaints (about 75%) and privilege but were a near total failure at identifying other problems. Their combined total was one. (In June M. G. (?) identified a Non-Owner Occupied property.) I identified customer complaints and privilege too. And at a higher percentage than they did. Plus I identified the loan servicer's systemic failure

that was the single biggest cause of the customer complaints. I also probably
identified a couple hundred loans with problems regarding force placed insurance,
short sales, Non-Owner Occupied, HAMP delays, origination fraud, prior liens, and
REO maintenance. Some of these problems were to become very important later in
the case.

23.     The rest of the team displayed a lack of competence and a lack of effort.
Initially they might not have been able to identify all of the types of problems that I
was finding but everyone doing second review saw what I was doing. They simply
could not be bothered to do it themselves. It was too much work for them, so they
didn't even try. That was even worse than doing nothing. The client was paying to
find out if there were problems with the loans. They gave an opinion that there were
no problems in probably thousands of loans in which there were significant
problems.

24.     Another example of their lack of effort was the extraordinary amount
of cherry picking of files that they did. ("Cherry picking" is taking files that appear to
require little work either because of size or some other characteristic. For example,
suppose someone finishes a file and then goes to sign out a new file but sees that the
next file is 500 pages but the one after that is only 100. If that person waits for
someone else to take the 500 page file and then grabs the 100 page file, then that
would be cherry picking.)

25.     Cherry picking should never be allowed. The only reason that people
do it is to do less and create the facade that they are doing more. Pick out some easy
ones, you don't have to work hard, but it looks like you have done a lot of work. It

was bad enough on the loan files but it reached epic proportions when the review moved from loan files to Activity Logs. It was easy to identify the Logs that did not have any attorney/client privileged entries in them. You didn't have to do much if any work on those. Initially, some people would wait for hours until someone else checked out a privileged Log and then quickly do any following non-privileged Logs. As the list of Logs to be reviewed got longer, they just jumped out of sight to the back to take the non-privileged Logs. (Actually it is doubtful that anything in the Logs could be considered privileged. Too many people, including outside vendors, had access to the Logs to maintain the confidentiality required for attorney/client privilege. But our instructions were to review as though they were privileged.)

26.     You might think that at least they were working. But most of the time they weren't. The four primary offenders had reviewed a combined total of around 1,100 non-privileged and 150 privileged Logs after about two months. I could have done that amount of non-privileged comments in a long weekend. I thought about it but couldn't bring myself to do it. Cherry picking is a total disgrace. I have higher standards. The few privileged Logs which they took were disproportionately small (most were under 20 pages) and, because they were done weeks after the sequential ones on the list, were of higher quality (because the first reviewers would have gained experience) and required much less work.

27.     When you see other members of the team behaving like that, you like to think that the people above you know what's going on and appreciate the people who are doing the real work. And they probably did but they still were determined to give their favored people unjustified credit. Khalid Jones did his best to help those

favored people look like they were doing work, even to the extent of engaging in highly unethical behavior.

28.    At the end of October (beginning of November?) the client made a huge change regarding the substance of the review. The client decided that entries in the Logs regarding a certain party were no longer to be considered privileged. This was huge because of the frequency with which this party appeared and the above average length of the Logs in which it appeared. With this change in the rules, a Log, which could have taken days to review, now would take minutes. This change would save the client a tremendous amount of money. Unless people were not told about it. With regard to the second review team, Khalid Jones only mentioned it to a few of his favored people (i.e. the gang of egregious cherry pickers and a few others).

29.    I found out about the new rule over a week later. We had to do an emergency second review of some recently first reviewed files. (By this time the client had replaced all of the BuckleySandler first reviewers with temporary attorneys from a legal staffing agency in order to reduce costs.) I noticed that the first reviewers had not made any privileged redactions in the affected Logs and was in the process of making them. I began to suspect that there was an information failure. So too did one of my colleagues sitting near me. Only when she said that she was going to call Khalid Jones did the other staff attorney, who shared an administrative assistant station with her, admit that Khalid Jones had told him and a few other people over a week ago. I told a few other people. They had already figured it out. I thought that everyone knew but some people did not know until a

staff attorney asked near the end of a meeting a week later. So Khalid Jones intentionally imposed substantial costs upon the client and diminished the quality of the work product in order to try to make his favored people look relatively better. And this wasn't the only incident in which Khalid Jones failed to update the entire team of changes in the rules. The situation became so bad that I had to search through recently reviewed files in order to find a consensus.

30.     Myself and another staff attorney had been complaining about the cherry picking problem for months to Henry ("Hank") Lindsley. Earlier that year, Kirk Jensen made Mr. Lindsley the Staff Attorney Manager. Basically he was (and still is) Kirk Jensen's assistant. His main qualification seems to be that he is a close personal friend of Kirk Jensen outside of work and has been since prior to his employment with Buckley Kolar/BuckleySandler. I don't know whether Mr. Lindsley did anything (actually I doubt it) but in November, one of the cherry pickers apparently was told to take files sequentially. He still did some cherry picking. You could rely on him to take the small files. But I still did nearly three times as many privileged Logs as he did.

31.     Never the less, in the beginning of December, Khalid Jones took me off the project. He had to do so in order to make it look like he actually believed what he wrote in my performance evaluation.

32.     My performance evaluation took place about two weeks later. That year it was with Kirk Jensen. Six people had filled out review forms regarding my work. There was a three level grading system and an allowance for additional comments. Three people graded me as "exceeds expectations". Two graded me as

"meets expectations". And one, supposedly anonymously but no doubt Khalid Jones,

graded me as "below expectations". When there is an aberration like that, it is

more likely evidence of a problem with the reviewer than the person reviewed.

However, as Mr. Jones's review provided a justification for what Kirk Jensen was

planning to do, it became the only review that mattered.

33.    Kirk Jensen mentioned three points from the review: 1 – work product

generally above average, 2 – not receptive to constructive criticism, and 3 – not

responsive to phone calls and e-mail. First, my work product was always above

average and by a significant degree. If he pretended to provide evidence otherwise,

then I'd like to see it in order to show it to be the lie that it is. [Consider this: Khalid

Jones had shown extraordinary favoritism to other people on the project, he

withheld important information from me and otherwise tried to slow me down,

later he even tried to publically humiliate me when I entered the building (infra at

para. 62), and subjected me to physical brutality (infra at paras. 63-64), and yet

even with all of his obvious animosity towards me the worst that he could say about

my work was that it was generally above average. Clearly my work far exceeded the

average.

34.    Second, the claim that I am not receptive to constructive criticism is a

clever slander. Attempts to refute it, may appear to validate it. But the falsity of the

claim can be established by the absence of any reason to make it. No example was

provided to me. The fact is that not once did I receive any type of criticism from

Khalid Jones. The only time that I received anything that even resembled criticism

was an email from Tom Dowell (a junior associate) on September 15, 2011 in which

he told me to change the format in which I was writing some of the Key comments. I replied and asked for some clarification. There was nothing impolite. He responded and I changed the format. [If I had six documents that put together showed that the loan servicer was relying on fraudulent appraisals in order to reject a short sale, then I would use the same description for all six. (Or the ones that I marked "Key" and cited to the ones that I didn't mark "Key".) It took a lot of time and effort to identify those documents and write those descriptions. Having to write the descriptions in four or more different ways that would make sense would have taken a lot of additional time (and probably a loss of clarity). But Tom Dowell wanted a unique description for each Key document. So that is what he got, sort of. I had an out where I could cite to a document without making it Key and writing a new description. So that is what I did. The problem with the loan still was identified.]

35.     At the time, I thought that it was a little odd of Tom Dowell to tell me to change the format after I had been doing it that way since January. He probably did it at the instruction of Khalid Jones.  This format issue only applied to me. No one else identified a Key issue by connecting multiple documents. This was how problems regarding force placed insurance, non-owner occupied, HAMP delays, and origination fraud were to be found. As mentioned (supra at paras. 21-27), the rest of the reviewers displayed a lack of competence and effort. Amidst all that malfeasance, I'm the person about whom Khalid Jones complains? Either you want the type of issues that I was marking as Key or you don't.  If you do, then where were the complaints to the others about doing nothing? And if you don't, then why

tell me to change the format instead of telling me not to bother? This was nothing more than a malicious attempt to find something about which to complain and for a way to slow me down.

36.    Third, the claim that I was not responsive to phone calls and e-mails is more lie than truth. Khalid Jones never called me. At least, he never left a message. (It would have been copied and put in the email system.) Was I supposed to call him because he thought about calling me?

37.    I did miss two e-mails. They were meeting notices to the entire group. I came in late, even later than usual. At the time, I was on a pace for 2,800 hours. I wasn't taking any days off. Occasionally, I couldn't put something off any longer or there was some unavoidable and unexpected problem or I was just totally worn out. Maybe I should have given up on coming in at all, called in, and took the whole day off. I still would have missed the meeting. I doubt that it would have been canceled for me. And how many meetings would I have missed at 1,800 hours? I probably would have missed more.

38.    It bears repeating that I was on salary for 1,800 hours. So I was giving the firm 1,000 hours (of first rate work) for which they were billing the client but for which I was not being paid. But both Khalid Jones and Kirk Jensen claim to prefer that I only did 1,800 hours than for Khalid Jones to have to tell someone at the meeting, "Give Matthew the highlights when he gets here." They are not serious.

39.    If it were so important, then they should have given me a smartphone so that I could check my email from home. Like they did for everybody else.

40.    The performance evaluation that Khalid Jones wrote about me was an

obvious fraud. Kirk Jensen knew it but pretended that it was credible because it helped him in what appears to have been a plan to give promotions to younger staff attorneys.

41.    BuckleySandler decided to create a new category of staff attorneys which they called Regulatory Attorneys. The title is misleading. It creates the impression that these attorneys are specialists in regulatory practice. (Which enabled the firm to charge more for them.) Some of those selected were but most (or close to most) were document reviewers.

42.    It would be less fraudulent to call the position "Senior Staff Attorney". The firm already had that title in use. After a large number of Skadden Arps partners and associates joined Buckley Kolar, LLP in April 2009 and created the new firm of BuckleySandler, LLP, several Skadden staff attorneys moved to the new firm. They were always treated as a privileged group. In December 2011 there were five of the former Skadden staff attorneys among the total staff attorneys. I believe that all of them and only them had the title of "Senior Staff Attorneys". (Henry Lindsley was promoted to Senior Staff Attorney in December. He was only in that position for part of the year until Kirk Jensen made him the Managing Staff Attorney.)

43.    The change was called a promotion. I thought that the promotion came with a raise. But later a credible source told me that not everyone who was promoted received a raise. Supposedly (according to Henry Lindsley), anyone who received even a single "exceeds expectations" on a performance evaluation was promoted. I received three. At that time, I thought that Kirk Jensen had no discretion in selecting who was promoted and that the single negative review was a

disqualification. But based upon the 2012 promotions, it appears that he had considerable discretion. Never the less, I did not complain at the time because I really don't like to complain and I thought that Kirk Jensen lacked discretion.

44.     Eighteen people in the D.C. office were promoted. Of these only two were over 40 years old. One of these was a former Skadden employee. So it was really one of thirteen. Additionally, one staff attorney in New York and (I think) four in Los Angeles were re-classified as Regulatory Attorneys. This was 100% of the staff attorneys in those locations. All of them were under 40 years old.

45.     Eleven of those who promoted had worked on the loan servicing project on which I spent most of the year. Most of these were the people whose work was shown earlier to have been incompetent and indifferent.

47.     The firm billed clients more for Regulatory Attorneys than Staff Attorneys. They had been billing clients at a rate of $225/hr. for Staff Attorneys. That stayed the same. However, they billed the Regulatory Attorneys at a rate of $275/hr. It was easy to see that this would be a problem in several respects.

48.     The firm was facing substantial competition from temporary legal services agencies for document review work. A client could go to an agency and hire reviewers for around $50/hr. These reviewers are referred to as "contract attorneys". Thus in order for the Staff/Regulatory Attorneys to be competitive they had to produce at a rate of 4.5/5.5 times that of the contract attorneys. Of course, the volume could be lower if they had a higher quality as measured by identifying the documents responsive to the request or finding other potentially important problems and issues.

49.     The quantity and quality of my work on the loan servicing project could justify a rate of $225/hr. and a lot more. The work of none of the others could justify that rate. And now a lot of them were going to be billed at $275/hr. This clearly was going to cause a decrease in business.

50.     The presence of both Staff and Regulatory Attorneys on the same project could lead to another problem. If the client bothered to check the production, then they would see that some of the Staff Attorneys were outperforming some or all of the Regulatory Attorneys. This happened on a couple projects that I was on in 2012. It didn't happen on a third only because there were no Regulatory Attorneys on that project.) The firm would not be able to justify the higher rate and its claim that the Regulatory Attorneys possessed superior skill and expertise would be shown to be a lie. Eventually the firm would have to go to a single title and billing rate. Clearly they would keep the Regulatory Attorney title with its higher billing rate. They also would keep the people whom they had moved into the Regulatory Attorney category and cut the remaining Staff Attorneys. This is simply too obvious to believe that it would not have been foreseen and was not part of the plan. I thought that it would take two years. It took one.

51.     Another relevant and notable event occurred in 2011. In January the firm hired L. F. and B. D. L. F. was over 40 years old and B. D. was close to 40. [B.D. was over 40 at the end of January 2013.] This was the last time in now nearly three years that BuckleySandler directly hired a Staff or Regulatory Attorney who was over 40 (or even close to 40) or was not white.  There were a few minorities and people over 40 who were hired as part of a large group of temporary staff attorneys

16

hired for a project through an agency. They had to pass a six month test period before they became regular staff attorneys.

52.     The few minorities and people over 40 were hired through agencies. They were hired as temporary staff attorneys as part of two projects of about 20-25 people each in October and November 2010. They were made permanent staff attorneys in April or May of 2011 in order to comply with labor laws.

53.     Another, S. H., was hired through an agency as a temporary staff attorney in mid 2011 as part of a large group for a specific project. Her employment was terminated later that year. She and another former temporary staff attorney returned at the end of May 2012, again as temporary staff attorneys. The other TSA, who was also over 40, was terminated on January 25, 2013 (the last Friday in January). Kirk Jensen tried to terminate S. H. too. In mid January 2013, S. H. was taken off of the project on which she had been working and replaced by a staff attorney who was around a dozen years younger. The client did not want to risk any personnel changes and vetoed the change. So S. H. was made a Regulatory Attorney on January 28, 2013 (the last Monday of January) rather than being terminated as Kirk Jensen had planned.

54.     After January 2011 approximately a dozen people were hired as Regulatory Attorneys. (However, some were classified as Law Clerks until admittance to the bar.) They were not hired on a temporary basis, as part of a group, or for a specific project. They were all under 40 years old and white.

2012

55.     I ended 2011 having worked around 2650 billable hours and about

17

150 non-billable hours. I began 2012 on some non-billable matters.

56.     In the back half of January, Khalid Jones, had a new project for a mortgage lender/servicer. It was a small project. He needed three people to review loan files and one to q.c. those three. At that time there was no shortage of Staff/Regulatory Attorneys from whom he could select. At least a dozen were waiting for an assignment and he had nearly a dozen more on another project (the I had been on) any of whom he could have transferred. However, he chose me as one of the reviewers. The other reviewers were Regulatory Attorneys (one was a transfer) and the q.c. reviewer was a Staff Attorney.

57.     This is additional evidence that the evaluation written by Khalid Jones was a fraud. Out of all of the people available, he picks someone whom he rated as "below expectations". Either he considered everyone else as totally awful (and some were) or the "below expectations" rating was a fraud. If Kirk Jensen took the reviews seriously, then he would not allow someone who someone who gives a staff attorney a negative review to then put that staff attorney on the top of his list of people to pick to be on his projects. Obviously, he didn't take the reviews seriously and was happy to go along with the fraud.

58.     The staffing on this project shows that there was no functional difference between Staff Attorneys and Regulatory Attorneys. My assigned work was the same as the two Regulatory Attorneys. And the higher level position of second reviewer (q.c. review) was held by a Staff Attorney.

59.     My work on the project was first rate from when I started to when I finished. At the start there was an issue as to whether the loans were fixed home

equity loans or home equity lines of credit (HELOCs). The client thought that they were HELOCs. I showed that they were fixed home equity loans. (One of the Regulatory Attorneys wanted to know what a HELOC was. So much for "superior skill and expertise".)

60.     During my last two weeks on the project I noticed an unusual problem with the latest group of loan files that we received from the client. The client thought that all of the loans had led to foreclosures and wanted us to review the files to see if they had done anything wrong. The files were often incomplete to some degree and we would note what was missing. With this last group of files I got the sense that things were missing because they never happened rather than because the documents were misplaced. I checked local court and property records and found several loans for which the client had not foreclosed. I sent that information to the second reviewer and the junior associate. I also put that information in a separate column in a big excel sheet that everyone on the project was using. The other reviewers saw what I was doing. They saw the problem. But they could not be bothered to do the same research. At least not on their own initiative. A few days after I was transferred from the project, the junior associate instructed them to go back, check the loans against the local court and property records, and put the information in the excel sheet just as I had done.

61.     I did first rate work on that project and I did it because that's what I do. I knew going into 2012 that Khalid Jones was going to give me another negative review. (The review period for 2012 began on November 1, 2011. Or maybe the last week of October 2011.) This belief was confirmed by some malicious treatment that

I received from him early in the year.

62.     In mid-January, I entered the main lobby of the building through the back doors. I heard someone shout, "Matt Ryan". I stopped and looked ahead. I could see some people in the lobby but not well enough to recognize anyone. I started walking slowly forward. I actually thought that everyone else had left the lobby. As I reached the elevators, I noticed a couple of people. I was only a few feet away from one, when I thought that I recognized him as Tom Dowell. He apparently realized that I was about to recognize him so he turned around. In another step or two I noticed Khalid Jones standing along the wall next to one of the elevators. He had that palms up, shrugging, "Well?" look. I said, "Hi" and kept walking. He knew that I don't see very well (actually very poorly). I'm sure he thought that this was funny. At least Tom Dowell (presumably) had the decency to be embarrassed.

63.     Toward the end of January, I informed the Staff Attorney Manager, Henry Lindsley, that I was having my wisdom teeth extracted on January 31. (I was going to have this done the previous year. But I knew that the loan servicer project was running slow, so I didn't want to take time off. But it couldn't be postponed any longer.) I told him that I didn't think that I would have to take any days off but I might. I also said that even if I didn't need to take a day off, I probably could not handle any additional work. So on Wednesday, Khalid Jones assigns me additional work for the loan servicing project that I was on in 2011. At that time he had around 15 people on that project of which at least nine were Regulatory Attorneys and the rest undoubtedly received better than "below expectations". A few of them were on this emergency project but most were not. They weren't expected to put in extra

time. So I had to stay late on Wednesday and come in early on Thursday. I thought that I'd get a break on Friday. But Thursday night around 10:30 I received an email from the junior associate from the mortgage lender/servicer project that stated that there was a team meeting early on Friday. The meeting was a total waste of time and the client's money. The junior associate said that she didn't know why Khalid Jones told her to call a meeting, maybe to say that the client was very cost conscious. We didn't know why because he never showed up. This cost the cost conscious client around $1,000. I suspect that the real reason was that Khalid Jones was pushing me extra hard that week because he knew that I was not well.

64.   I made it home that Friday afternoon and collapsed on the floor. I had a concussion and woke up a half hour later in a pool of blood. The bleeding wouldn't stop so I had to go to the hospital to get stitches. The next week I had to take off on Monday through Wednesday while the blood cleared from my face. This was the first time since I became a temporary staff attorney at the beginning of January 2010 that I had taken a day off. (In my over thirteen months as contract attorney with Buckley Kolar, LLP, I had taken one day off.)

65.   I informed Henry Lindsley what happened and I'm sure that he informed Kirk Jensen. This should have raised a red flag. It was clear that I was being subjected to very unfair treatment by Khalid Jones. At a minimum, he should have been reprimanded and I should have been pulled from all of his projects immediately. I don't think that this malicious and brutal treatment would have been tolerated had it occurred to anyone else. Or at least anyone whom Kirk Jensen wasn't looking to get rid of. Kirk Jensen did nothing.

66.    I wasn't taken off that project until the middle of March. I was assigned to a document review project for an insurance company that provided force placed insurance. I was not re-assigned because Kirk Jensen finally decided to separate me from Khalid Jones but rather because the partner and senior associates on the insurance project were either familiar with my work or reputation and wanted me on the project. The Khalid Jones project was supposed to have been finished by the start of the insurance project. It wasn't. It actually lasted a couple of weeks after I left.

67.    There were around 20 Staff and 2 Regulatory Attorneys assigned to the insurance project. The project initially consisted of two matters: 1 – class action litigation in a federal court and 2 – a state Civil Investigative Demand (a request for documents by a state agency in order to determine whether to file formal charges). The partner on the case also informed us that the client potentially had 13-20 more cases. (I forget the exact number. It certainly was over ten.)

68.    I started on the class action litigation matter. It was the smaller of the two and the plan was for us to join the bigger project later. But after only a few days it was suspended because of a court order. So I was transferred to the state CID matter. The first group of documents consisted of about 213 files. I did around 20. (It was definitely more than twice the average of the rest.)

69.    The firm almost lost the review in this early part of the project. They had told the client that the reviewers could maintain an average pace of 50 documents per hour. These were difficult files. Not even I could do 50 per hour. I think that I started at just over 30 and ended at just over 40. The rest of the team

was moving at half of that. That's a long way from 50. We were told that the client

was considering hiring contract attorneys through an agency to replace us. The

others picked it up enough that the client stayed with us. (I don't know how much of

a discount, if any, that the firm gave.) Without my work, the firm probably would

have lost the project then.

70.     The second group of documents was around 3,200 files. [Plaintiff will

get exact numbers in Discovery.] These were easier to review but I don't think that

the team averaged 50 documents per hour. I don't even know if I did. During the

first few weeks of this phase of the project I spent most of my time doing redactions

on the previous set of documents. When I rejoined the review full time (or close to

it) I was again reviewing more than twice the average of the others.

71.     In the beginning of May, I had had enough with the lack of effort of

almost everyone else on the team, especially the two Regulatory Attorneys. I was

working seven days a week for about 55 hours a week. (And that was at least 55

hours of serious work. Not billing just for being there.) Everyone else was doing 40

hours at most. The Regulatory Attorneys were supposed to be the best people on the

team. They should have had the awareness and motivation to do some extra work

when they had been told that the project was moving too slowly, the client was

considering hiring contract attorneys to replace us, and this probably was

eliminating our chances of getting any of the potential dozen or more other projects.

But no. They maintained a leisurely pace through the week and took the weekends

off.

72.     All that I could look forward to was another fraudulent evaluation and

further abuse from Khalid Jones. So I decided to take a vacation for June. Almost all of it, from the first Monday to the last Friday. I earned it. I had not asked for any time off before then (except for three days after the concussion in February). I had worked over 2,600 hours in each of the past two years. And even with taking off for June I still would have billed more hours on that insurance project than anyone else at the end of June.

73.     I told Henry Lindsley in the beginning of May that I was taking off June. I told him again several times over the next couple of weeks. At least a couple of times he asked what it would take to get me to not take a vacation. I told him that I expected an apology for all of the mistreatment that I had received. In the last week of May I realized that Henry Lindsley had not informed either the partner or any of the senior associates on the project of my vacation plans. He admitted it. Apparently he thought that if he didn't tell them then I wouldn't get approval, so I wouldn't take a vacation. I disabused him of that idea.  I told him that I wasn't showing up in June, they were going to ask him why, and then he could tell them that he knew for the past month that I was taking time off but kept it a secret. He finally told them (but probably not the part about knowing for at least two weeks).

74.     The next day, Henry Lindsley, appearing nervous and desperate tried again to get me to not take a vacation. He asked me how much money it would take to get me to work in June and that he would go to the partners and try to get it approved. I told him not to do that. I said that I would forgo my planned vacation if the partner in charge of the project asked me to stay. She never asked. Probably because Henry Lindsley never gave her the message.

75.     In the third week of May, I was selected to be on the second review team. Also selected was another Staff Attorney, G. C. None of the Regulatory Attorneys was selected. We joined four associates (two senior and two junior) who were second reviewing the files on a part time basis. The next week a third Staff Attorney, B. D., was selected to be on the second review team.

76.     I worked through the first Sunday in June and then I went on vacation. In an attempt to replace me, the partner on the project added twelve attorneys to the second review team and increased their hours from 40 to 50 per week. (And at the end of June, I still had more hours than all or almost all of them. I certainly did by the end of July.) The twelve consisted of the two Regulatory Attorneys, nine Staff Attorneys, and one Temporary Staff Attorney. They totally failed.

77.     I returned on the last Saturday in June and was stunned by how little they had accomplished. They only reviewed an average of four files a day. (I averaged around twenty.) I later learned that it was even worse than it appeared. Much worse.

78.     On second review we were instructed to review 100% of the documents that were marked "Responsive" and 10% of those marked "Non-Responsive". I reviewed all the Responsives, 10% of Non-Responsives, plus any Non-Responsive documents that had a subject name that did not indicate an overwhelming likelihood that the document was in fact Non-Responsive. For example, the subject of flood insurance was N.R., so if I were at or over 10% and a document had a subject name of Flood Insurance, then I would not check it out. But if the subject name was less clear, for example, Insurance Rates, then I would review

it. It may have been another flood insurance document or it may have been a Responsive type of insurance. I made sure that every file that I reviewed was perfect. Of the rest of the Staff and Regulatory Attorneys, only B. D. second reviewed documents in this manner. Her work was perfect too. Unfortunately she combined her high quality with a low quantity (but about the same as the others).

79.    The twelve people who were supposed to replace me performed incompetently and disgracefully. They reviewed 100% of the Responsive documents. But they never really understood the Document Request or the insurance practices at issue. (It was moderately complicated. But the main reason that they did not understand it was because they never made an effort to understand it.) So all that they did was repeat the errors that they made on first review. They did review 10% of the Non-Responsive documents. But they targeted the ones with obvious Non-Responsive subject headings. And if by chance they happened upon an N.R. document that required some thought then they would put it back, pretend not to have seen it, and take another document. (The software keeps a very good record of what was done.) They never did more than the 10% minimum. So their work would seem to have been useless. Actually it was worse than useless.

80.    In order to do their required 50 hours per week, they were allowed to work from home part of the time. (I never worked from home.) They would do two or three files during the day at work, then go home and do one or two more. As bad as their day work was, their work at home was bizarrely awful. They clearly were not paying attention. It was as if they would code randomly while watching television. They turned badly reviewed files into extraordinarily badly reviewed

files.

81.     G. C. was sort of a mix. He didn't do an expansive review of the N.R. documents but it wasn't limited to the obvious N.R. ones either. He put back some of the difficult ones but he took a try at others. He had a much better understanding of the substantive issues than the dozen replacements. And he didn't work from home. So he generally did quality work and a decent quantity too.

82.     By the third week of July, after a month away, I had second reviewed around 480 files. G. C. probably had reviewed around 420. (I definitely recall that it would have taken him at least a week at his pace to catch up to where I was.) However, both G. C. and I were then taken off of second review and assigned to a specially created level of third review. This was very unusual. I can't recall any other projects having a third review level. Certainly none like this.

83.     The partner and senior associates finally realized that the work of the dozen people who replaced me was total garbage and needed to be re-done. (As mentioned, B. D.'s work was perfect and did not need to be re-reviewed.) The procedures for this third review were the same as those for the second review but instead of reviewing 10% of the N.R. documents we were told to only review 5%. I still reviewed everything.

84.     The replacement reviewers continued to second review the remaining files. (Although at this point there were only ten. Two had been moved to Privilege Review, i.e. withholding documents subject to attorney/client privilege, in mid-July.) They finished second reviewing all of the files in mid-August. The quality of their work was just as bad at the end as it had been in the beginning.

85.    The third review team consisted of myself, G. C., and five associates (two senior and three junior) who worked on it part time. They were looking to add someone from the replacement reviewers but they couldn't find anyone good enough. A few weeks after the start of the third review, Henry Lindsley asked me if any of them were good enough to be moved to third review. I told him that some of them were good enough to achieve mediocrity during the day but in the evening, when they worked from home, they were totally awful.  However, sometimes they would confuse me by doing awful work during the day too. For example, I was reviewing a file and it was terrible. I thought that it had been second reviewed in the evening. I checked the document history. One of the Regulatory Attorneys had reviewed it at around 2:00 p.m. I couldn't understand it until I checked out the next file. It was awful too. I checked the history. It was reviewed by the same Regulatory Attorney at around 3:00 p.m. Now it was clear. The attorney spent all morning not doing any work and then rushed through some files in the afternoon to meet his self set unofficial quota. (If you do that kind of thing as a contract attorney on a project, you'll get fired. But at BuckleySandler, Kirk Jensen will give you a promotion. As long as you're not over 40.) Henry Lindsley said that he would have a talk with them about working from home again. (Apparently there were problems on other projects.) However, based on the continued low quality of their work, it either does not appear that he did so or it was a waste of time.

86.    All of the work done by the replacements was essentially trash. But it was very expensive trash. At the regular billing rates it would have cost the client $1,530,000. [$275 for 2 Regulatory Attorneys for 50 hours per week for 12 weeks

(minus $275 for 1 Regulatory Attorney for 50 hours per week for 6 weeks) plus $225 for 10 Staff Attorneys (this includes the TSA) for 50 hours per week for 12 weeks (minus $225 for 1 Staff Attorney for 50 hours per week for 6 weeks)] To this should also be added the expense of a first reviewer whose work was so bad that it had to re-first reviewed. The cost for that was $90,000. [$225 for 1 Staff Attorney for 40 hours per week for 10 weeks] The combined total is $1,620,000. Of the 13 people who produced all of this garbage, 2 were Regulatory Attorneys, 3 were made Regulatory Attorneys, and another was intended to be made a Regulatory Attorney. By making (and trying to make) them Regulatory Attorneys, Kirk Jensen implicitly claims that they did great work. The client might have a different opinion.

87.     In contrast, it took me about eight weeks to correct close to half of the files that they totally messed up. Assuming that it would have taken 20 weeks for me to have done all of it (and that's probably more than necessary), the cost would have been $247,500. [$225 for 1 Staff Attorney for 55 hours per week for 20 weeks]

88.     We finished the third review in the second week of September. As usual, I reviewed more files than anyone else. I spent the next couple of weeks assisting Privilege Review and working on miscellaneous matters for the project. In the last week of September the project ended. I decided to take another vacation. I earned it. I carried that project. It would have totally collapsed without me. The replacements were essentially on vacation while they were billing for the project. And many of them had not done anything since the second review ended in August.

89.     I said that I would be out for two months. I was out for one. I returned for another document review project. However, I told Henry Lindsley that because

29

this was still my vacation time, I wanted it official that I wouldn't have to come in before noon. One of the partners on the project said that would not be a problem. It was an unusual project for BuckleySandler. Usually they represent the defendant, but in this case they represented the plaintiff. I think that they overrated the complexity of the project. But they were looking for people who were very good noticing that a document that was seemingly innocuous actually fit in to a broader pattern of misconduct. There was no shortage of Staff, Regulatory Attorneys, and soon to be Regulatory Attorneys whom they could have selected. They selected myself and two other Staff Attorneys.

90.    It turned out that all we had to do was hunt down account numbers in the documents. I'm not sure that it even qualified as legal work. I couldn't justify charging $225 an hour for that, so I heavily discounted my time. I was on this project into the beginning of January. I ended the year with about 1,850 hours of billable work and 120 hours of non-billable work. This was more than required. And more than a lot of other people including people who were made Regulatory Attorneys.

91.    In November, while I was on that other project, the class action federal court litigation project for the insurance company, which I had been on in March until it was suspended, re-started. As mentioned, it was a small project and only required a few people. Most of them were veterans of the larger insurance project. B. D. was on the project. She took a leading role and again was doing second review. Also assigned to the project was one of the few Regulatory Attorneys who actually specialized in regulatory work. She had not previously been on either of the insurance projects. She actually had other work at that time but was still was put on

this project. However, there were at least two (probably three) people from the large insurance project who then were doing nothing. They were not selected because they were awful and their work was garbage. Everyone knew it. But Kirk Jensen made them Regulatory Attorneys.

92.    In mid December I had another performance evaluation with Kirk Jensen. This year I had three "exceeds expectations", ten "meets expectations", and no "below expectations". I was surprised at the number of reviews. They allowed Regulatory Attorneys to give a review for Staff Attorneys for whom they acted in some type of oversight manner. None of the Regulatory Attorneys with whom I worked met that requirement. But I suspect some of them wrote a review anyway. And a mere "meets expectations" at that. A lot of them were corrupt.

93.    I thought that there should have been a lot more "exceeds expectations" in the reviews. But Kirk Jensen said it was really very good. He also said that the bonus had not been decided yet but were probably going to less then the year before because the firm had not done as well. There were no negative comments in the reviews and he had nothing negative to say.

94.    Although disappointed that there were not more "exceeds expectations", I didn't really want to argue about it. I thought that the reviews were good enough that I would be made a Regulatory Attorney so there was no purpose in arguing over any of the reviews. I soon found out that I was mistaken. I learned that the people who were being made Regulatory Attorney were being told of that in the evaluation. So I was passed over. I was outraged and I said so to Henry Lindsley. About a week later he told me that he spoke to Kirk Jenson. Kirk Jensen had said that

I met the qualification for being made a Regulatory Attorney. (The qualification apparently was a single "exceeds expectations" rating from someone at the level of associate or higher.) However, he didn't make me a Regulatory Attorney because he didn't think that I was "motivated". That's not credible. That past year I worked until I dropped. Then on the insurance project I did more work than any other Staff or Regulatory Attorney. Actually I did more than all of them combined. The garbage that most of them produced doesn't really count as work. So, aside from myself, that leaves only G. C. and B. D. who had any positive production. And I did more than them combined. That didn't just happen. I was motivated to give the client a really good deal for my work. And I did.

95.     If Kirk Jensen actually believed that I didn't seem motivated, it is likely the result of a belief that older people don't work as hard and no amount of reality could overcome that prejudice.

96.     A week later the list of people made Regulatory Attorney was announced. There were six people on it. Surprisingly four of them were over 40. Three of them were from the insurance project. One was G. C. That may have been a justifiable selection. But I did more work (my per hour production was over twice what he did), more hours, and I had a higher quality. The other two were among those whose work was so bad that it was thrown in trash. They were not selected to work on the related insurance project in November. At least one of them spent the final months of the year doing nothing. I don't think that either of them or another Staff Attorney who became a Regulatory Attorney, M.P. (and who was under 40), had 1,800 billable hours for the year. I doubt that all of them had at least one

"exceeds expectations" review. Their work was of poor quality and not in demand.

97.     They were not selected on the merits but rather to provide cover for the policy regarding new hires. As mentioned, after January 2011 the firm did not hire any new Staff or Regulatory Attorneys who were over 40. And after the creation of the Regulatory Attorney title the firm did not hire even a single African-American for any of those positions. It may have hired one or two Asian- Americans in the L.A. office but in the D.C. the new hires were all young and white. (Kirk Jensen probably didn't do the hiring for the L.A. office.) In order to keep a legitimate ratio among the total staff, he needed to give a few Staff Attorneys over 40 the title of Regulatory Attorney. And he needed to give a few African-American Staff Attorneys the title of Regulatory Attorney. If he could double up on some of them, then all the better from his perspective. He would have another spot (or potential spot) open for him to fill with a young white person. And that is exactly what he did. A few weeks after all of the Staff Attorneys were terminated, he hired another young white person.

98.     Thus there was a quota that acted as a ceiling on promotions for those over 40 and minorities. There were deserving people over 40, such as myself, who were not made Regulatory Attorney. My work was clearly superior to that of M.P. (another young white person) but he got a promotion and not me because Kirk Jensen already had filled his quota of people over 40, so he felt free to promote a less deserving person under 40. B. D. similarly suffered.

99.     The quota system also worked in another manner. A young African-American Staff Attorney, D. S., was assigned to a loan file review in July 2012. It lasted into December. The project initially took place at the client site a few

blocks away. Later the reviewers were allowed to access the loan files from the BuckleySandler office.

100.    I sat in an administrative assistant station next to D. S. and a Regulatory Attorney who was also on the project. When they returned, the Regulatory Attorney constantly was asking her questions about what he should do. She knew the substance and procedure. She always had the answer right away. But she clearly got frustrated at having to do his work too. So she went back to working at the client site. She returned after a couple weeks. But the situation repeated itself and she went back to the client site.

101.    Also the reviewers were supposed to do 50 hours a week and were assigned 25 files that they were to review each week at a minimum. D. S. went straight at it. She wasn't afraid of doing the tough ones. She did them all or close to it. The Regulatory Attorney would cherry pick the small ones from his assigned set. He'd do around twenty and the big files would be put back in the system for someone else to do. What a disgrace.

102.    In late November (I think) I said to Henry Lindsley, "D. is really kicking __ on that project." He replied, "Yeah, other people have told me that too." She must have really stood out because the rest of them (not necessarily everyone but generally) did very poorly. The project was persistently well behind schedule. They kept adding Staff and Regulatory Attorneys in a desperate and failed attempt to get back on schedule. It is worth noting that even in this desperation some of the people later made Regulatory Attorney were sitting around doing nothing. Everyone knew that they would make it worse.

103.   D. S. deserved a promotion much more than those "do nothings". However, Kirk Jensen could meet his quota of African-Americans with the two who were also over 40. He wasn't going to give that up. If he replaced one of them with D. S. then he would need another attorney over 40 and wouldn't be able to promote the young and white, M.P. So she wasn't promoted and then was terminated.

104.   A notable omission from the list of new Regulatory Attorneys was B. D. Her work was clearly superior to theirs. And in November, she was selected to work on the other insurance project. The others were not. At least one (probably both) spent the final months of the year doing nothing. As did some else who was later made a Regulatory Attorney.  But B. D. was over 40 and Kirk Jensen already had filled his quota. And he didn't need an Asian-American.

105.   I did receive a bonus of $10,000. That was the same as the previous year. It was standard in 2011 (maybe) but in 2012 it was more than most.  Some of those designated Regulatory Attorney did not receive a bonus, or a raise, or any different duties. But don't feel too bad for them. They didn't deserve a bonus. They did get a new job title (that they didn't deserve either) that kept them from getting cut. That was worth something.

2013

106.   On January 28, 2013 (the last Monday in January), three more people were promoted to Regulatory Attorney. They were S.H., S.S., and D.M. (who was one of the people whose work on the insurance project had to be re-done).

35

107.    The case of S.H. was mentioned supra at para. 53. She was a Temporary Staff Attorney (who, contrary to policy, had worked there for over six straight months). She was over 40 and in mid-January Kirk Jensen tried to remove her from the project which she was on and replace her with someone who was around a dozen years younger (in the mid 30s range). The client objected to the change, so Kirk Jensen was stuck with S.H.

108.    S.S. was also over 40. However, she was in a different class than that of ordinary Staff Attorney. As such she was involved in a different type of work and had different responsibilities in addition to the time which she was assigned to ordinary Staff Attorney work. It was for this additional work that she was given the unique title of Regulatory Attorney and Pro Bono Coordinator.

109.    The third selection was D.M. He was under 40. D.M. was selected because he has some connection to one of the firm's clients. This is an implicit admission that their work for this client could not stand on its own merits but required a pay-off to one of the client's friends (or family or whatever). If the pay-off simply were a kick back out of the client's pocket, it would have been bad enough (and probably illegal). But D.M. was another of the people who produced total trash for about ten weeks on the insurance project. Although in his case it was at the first review level. It was not unusual (based upon what I had heard about his work) and probably expected (based upon the total lack of effort evident in his work on the insurance project) for his work to be total garbage. Thus, in order to keep D.M.'s friend as a client, BuckleySandler was charging other clients $225/hr. (now $275/hr.) for someone whom it knew did not do any useful work.

110.    As soon as the promotions were announced, I knew that the Staff Attorneys were getting terminated. I went to Henry Lindsley to try to get confirmation (or an explanation). He had not connected the recently announced promotions to any imminent terminations but said that he would try to contact Kirk Jensen who was not in the office that day (and he said that Kirk Jensen would not be in until Thursday). A couple hours later (around 7:00 p.m.) Henry Lindsley saw me on his way out. He said that he had not talked to Kirk Jensen but advised me to sign any severance deal that I may be offered.

111.    On Thursday January 31, 2013 at noon an email was sent to all of the Staff Attorneys to attend a meeting at 3:00. Kirk Jensen arrived at the meeting and announced that we were all laid off. Of the 17 who were laid off, 8 were over 40. And only two were non-minority and under 40. [To these numbers should be added the temporary staff attorney who had been there for over six months, which should have made him a regular Staff Attorney, and was laid off the previous Friday. So the real total is 9 of 18 who were over 40.]

112.    Kirk Jensen said that all of our computer accounts already had been closed. He said that this had to have been done because many of the clients required them to have very strict security policies. Maybe so. Actually, I don't doubt it. But it is an interesting contrast with the manner in which they treated Khalid Jones when he finally was forced to leave.

113.    The firm wanted Khalid Jones to become a member of the D.C. bar. He had an application pending there for nearly three years. (Or, at least, that's what the firm believed.) Before working at BuckleySandler, Khalid Jones had been the co-

founder and General Counsel of an investment fund from which all of the clients' money and business records had disappeared. That was above the low ethical standards of BuckleySandler, however, it was below the standards of the D.C. Bar.

114.    At the beginning of June 2012, it became clear to BuckleySandler that the D.C. Bar was not going to grant admittance to Khalid Jones. He was given at least two weeks to leave. He did not have his account closed. On June 22, 2012 he sent a firm wide email announcing that he was leaving that day. (That is when I learned of his departure. However, I later heard that he had been telling people about it weeks earlier.) Apparently the contractually required strict security policies were not applied to Khalid Jones. This is another example of the low character and corruption of BuckleySandler. [I was on my month long vacation at the time. I thought about returning a week early but decided against it. Khalid Jones treated me maliciously and brutally but others condoned it.]

115.    We were also told that two boxes were placed at our desks. We were to pack up and get out. We could ask them to send anything that we couldn't carry. Our building pass keys would be canceled at 5:00.

116.    I wanted to speak with Kirk Jensen before I left. I asked his secretary if he was available. She said that he was on a phone call until six. I said that I would wait. And I did. I saw him around 6:20. He said that the lay-offs were not personal, it was a business decision. I said that I was never the less concerned that as not everyone was laid-off, some people might see this as a reflection of the quality of my work. He seemed to pretend that this was a new idea to him but agreed that it was a possibility. I asked what went so wrong for me here that it had come to this. He said,

"I think what you're asking is why weren't you made a Regulatory Attorney?" I said, "Yes". He said that if people tell you to come in early and you don't do it, then there are going to be consequences for that. I said that there was only one incident when I was told to come in by 9:30 but I was arriving late. I got in a little trouble for it, but then I arrived by 9:30 and that was over two and a half years ago. He became very indignant, raised his voice and said, "The decision has been made. It doesn't matter anymore." I said that it mattered to me. I had to protect my reputation. I couldn't allow some story that people had told me to come in early but I refused to go unchallenged. Nobody told me and I had a rational reason to believe that they preferred that I worked the hours that I did because my hours and productivity greatly exceeded that of anyone else. He said that they would have preferred that I came in early and did all the additional work.

117.    The unsaid reply to that was, "So what?". That wasn't the reality. Nobody else did both. They came in early but didn't do the work. But Kirk Jensen made them Regulatory Attorneys. So he clearly is stating a preference for people who are not working but doing standard hours than for someone giving the client an exceptional value but arriving late. No one else took this position. That is why I was in demand whenever I was available and a new project was starting but others, whom he made Regulatory Attorneys, were not selected to be on projects and sat around doing nothing.

118.    Nor do I think that the clients would agree with him. It is inconceivable that the insurance company which paid over $1.6 million for garbage would prefer the 6 of 13 people responsible for that whom Kirk Jensen promoted or

tried to promote. But Plaintiff will ask them to be sure.

119.    It is worth noting that Kirk Jensen did not repeat the canard that I didn't seem motivated that he told Henry Lindsley six weeks earlier. This time he must have realized that that was such untenable nonsense that he needed a different excuse. So he tried another lie. But this one was even more preposterous.

120.    The reason that the answer was left unsaid was because I was going to ask to use him as a reference on employment applications.  I asked. He said that he didn't feel qualified because I hadn't directly worked for him recently. He suggested that I ask the partner on the insurance project. [Interestingly she was the person who set the 9:30 arrival policy on the project two and a half years ago on which I got in trouble. There was a notable absence of an arrival policy on the insurance project.] I said that I wouldn't ask her because I still was afraid of her. But I told him that I had worked directly for him for around 16 months in a little less than the past four years. That was a lot of fairly recent time. He reluctantly agreed.

121.    In mid March I signed and returned the waiver of claims in exchange for severance pay. The waiver was invalid. The waiver listed the seventeen Staff Attorneys who were terminated and who were all eligible for a severance agreement. (The offers were not all the same.) However, it failed to list the ages of all individuals in the same job classification or organizational unit who were not terminated. BuckleySandler claimed that there were no individuals in such classification. That claim is false. All of the Regulatory Attorneys (and law clerks) were in the same classification. They both were non-associate level positions. There was no difference between their respective assignments and responsibilities. They

were used interchangeably. In fact, on two projects on which I worked in 2012, the higher level review (senior) position was assigned to Staff Attorneys rather than the Regulatory Attorneys on the project. Nor did the Regulatory Attorneys necessarily receive a higher salary or bonus. The Regulatory Attorney position was in effect merely a different job title given to people to get them off the termination list.

122.    In April and July of 2013 Plaintiff was contacted by Henry Lindsley, the Regulatory Manager. In both instances BuckleySandler was staffing a project and was offering some of the former Staff Attorneys a position as a Temporary Staff Attorney. Plaintiff did not accept either offer. One former Staff Attorney who did was B.D.

123.    On July 26, 2013 Plaintiff submitted a complaint to the E.E.O.C. On (or about) August 15, 2013 BuckleySandler re-hired B.D. This time as a Regulatory Attorney. On August 27, 2013 the E.E.O.C. declined to pursue the matter and issued a Right To Sue Letter. B.D. was laid off on September 6, 2013. She was re-hired at the end of the month as a Temporary Staff Attorney. Hiring B.D. was an obvious attempt by BuckleySandler at damage control. Clearly they knew that they had a problem with E.E.O. law compliance. But as soon as they thought that they were not going to get caught, they fired B.D.

124.    Interestingly, while BuckleySandler was re-hiring some of the former Staff Attorneys as Temporary Staff Attorneys and hiring more young white Regulatory Attorneys, one of the original Regulatory Attorneys was not being given much (if any) work. R.R. was a staff attorney who was recruited from Skadden, Arps, Slate, Meagher & Flom, LLP shortly after the merger of Buckley Kolar, LLP and a

large number of Skadden partners and associates into the new firm of

BuckleySandler, LLP in March 2009. He held the title of Senior Staff Attorney and

then Regulatory Attorney. The quality of his work was better than that of most of

the people who became Regulatory Attorneys. However, he was over forty. He saw

that he was being pushed out. He resigned at the end of July.

## VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, 29 U.S.C. § 621, ET SEQ.

125.    Plaintiff, Matthew J. Ryan, hereby incorporates by reference and

realleges Paragraphs 1 through 121 of this Complaint as if fully restated herein.

126.    The Age Discrimination In Employment Act of 1967 ("ADEA"), codified

at 29 U.S.C. § 621 et seq., protects individuals who are 40 years of age or older from

employment discrimination, and makes it unlawful for an employer to discharge or

otherwise discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment because of such individual's age.

127.    The Defendant's discriminatory treatment and termination of Plaintiff

violated the ADEA. Specifically, BuckleySandler established a ceiling on the number

of people over 40 years of age and minorities whom it designated "Regulatory

Attorneys". BuckleySandler only designated the minimum number of Staff Attorneys

as Regulatory Attorneys as they thought necessary to keep from revealing obvious

bias in the demographic composition of their current staff and their future staff

based on a continuation of their policy of hiring only young white people for

additional Regulatory Attorney positions. BuckleySandler's selection of Staff

Attorneys who were given the title of Regulatory Attorney can not be justified on the basis of performance. But for BuckleySandler's discriminatory quota system, Plaintiff would have been designated a Regulatory Attorney and would not have been laid off. Further, Defendant's actions constitute a willful violation of the ADEA.

128.    The alleged waiver that Plaintiff signed after being laid off in January of 2013 is not valid. Waivers of rights and claims under the ADEA must comply with 29 U.S.C. § 626(f) and 29 C.F.R. § 1625.22. A waiver must provide "the job titles and ages of all individuals eligible or selected for the program [i.e. "an exit incentive or other employment termination program"], and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program." 29 U.S.C. § 626(f). The alleged waiver failed to provide the job title of Regulatory Attorney and the ages of those having that designation. There was no functional difference between the Regulatory Attorneys and the Staff Attorneys. What BuckleySandler did is analogous to an employer of 100 people digging ditches. Suppose the hundred had the title of Diggers. The employer then decides that he wants a younger and whiter staff. So he creates a new title of Shoveler for 60 people and sets a ceiling of 10 spots for people over 40 and minorities (or some combination thereof) and then terminates the other 40 employees of whom 36 were over 40 or minority. (Sixteen of the eighteen people laid off by BuckleySandler in January 2013 were over 40 or minority.) The employer is not allowed to hide potential evidence of discrimination from those laid off by giving the beneficiaries of such discrimination a different title.

129.    The Defendant's willful, wrongful, and discriminatory actions against

and termination of Plaintiff and violation of his rights under the ADEA caused and continue to cause Plaintiff economic and non-economic damages, including, but not limited to, lost past and future wages, bonuses, health insurance, benefits and privileges of employment, emotional distress, embarrassment, humiliation, mental anguish and depression, physical and mental stress, loss of reputation, and a violation of his rights.

130.    Pursuant to 29 U.S.C. § 626, Plaintiff is entitled to legal and equitable relief, including reinstatement and/or promotion to the position that he would have had but for the Defendant's violation of the ADEA, trial by jury, and liquidated damages due to the willful nature of the Defendant's discrimination against Plaintiff.

### VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, D.C. CODE § 2-1401 et seq.

131.    Plaintiff, Matthew J. Ryan, hereby incorporates by reference and realleges Paragraphs 1 through 127 of this Complaint as if fully restated herein.

132.    The District of Columbia Human Rights Act, D.C. Code § 2-1401 et seq., prohibits discrimination based on an individual's race or age.

133.    Defendants (BuckleySandler, Jensen, and McGinn), in violation of the D.C. Human Rights Act, knowingly and intentionally engaged in unlawful discrimination against Plaintiff based on his age. The discriminatory acts engaged in by Defendants include terminating the employment of Plaintiff.

134.    Defendants had no legitimate business reason for any such acts.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendant, and that the Court:

A.      Award Plaintiff direct and consequential compensatory economic damages for lost past and future wages, bonuses, health insurance, pay and benefits, and privileges of employment caused by the BuckleySandler's discriminatory acts as charged herein in violation of the ADEA;

B.      Award Plaintiff reinstatement and/or promotion to the position that he would have maintained but for the Defendant's discriminatory conduct as charged herein in violation of the ADEA;

C.      Issue a temporary or permanent injunction, enjoining BuckleySandler from committing further discriminatory acts against Defendant in violation of the ADEA;

D.      Declare BuckleySandler's conduct in violation of the ADEA to be illegal;

E.      Award Plaintiff liquidated damages for BuckleySandler's willful violation of the ADEA pursuant to 29 U.S.C. § 626(b);

F.      Award Plaintiff pre-judgment and post-judgment interest, as allowed by law;

G.      Award Plaintiff attorneys fees (if later needed), expert witness fees (if later needed), and costs in accordance with 29 U.S.C. § 626(b) and F.R.C.P. 54 (d);

H.      Award Plaintiff a trial by jury pursuant to 29 U.S.C. § 626(c);

I.      Award Plaintiff such other legal and equitable relief as is just and proper.

J.      Issue an Order declaring Defendants' actions to be a violation of the District of Columbia Human Rights Act, D.C. Code § 2-1401 et seq., and declaring Plaintiff eligible to receive equitable and other relief;

K.      Enter judgment in favor of Plaintiff against Defendants.

L.      Issue a permanent injunction prohibiting Defendants from engaging in

any discriminatory promotions, discipline, terminations, and retaliation;

M.      Award Plaintiff all equitable monetary damages available under the

law, including but not limited to back pay and front pay in amounts to be

determined at trial;

N.      Order Defendants to pay compensatory and punitive damages in
amounts to be determined at trial;

O.      Order Defendants to pay Plaintiff's attorneys' fees (if later needed),
expert witness fees (if later needed), and costs;

P.      Order Defendants to pay pre-judgment and post-judgment interest as
provided by law.

## DEMAND FOR JURY TRIAL

NOW COMES Plaintiff, Matthew J. Ryan, and hereby demands a trial by jury in

the above entitled matter.


Respectfully submitted,

Matthew J. Ryan
(D.C. Bar #432707. Note: Mr. Ryan is filing pro se and
is not a member of the bar of the United States District Court
for the District of Columbia.)
5480 Wisconsin Avenue, Apt. 615
Friendship Heights, Md. 20815
301-718-7868

Dated: November 19, 2013

# Certificate Of Service

I certify that the foregoing Complaint was served or will be served by

certified mail on November 19, 2013 on the following:

BuckleySandler, L.L.P.
1250 24th Street, N.W.
Suite 700
Washington, D.C. 20037

Kirk Jensen
18401 Broad Leaf Road
Boyds, Md. 20841

Elizabeth McGinn
7313 Venice Street
Falls Church, Va. 22043


*Matthew J. Ryan*
Matthew J. Ryan
(D.C. Bar #432707. Note: Mr. Ryan is filing pro se and
is not a member of the bar of the United States District Court
for the District of Columbia.)
5480 Wisconsin Avenue, Apt. 615
Friendship Heights, Md. 20815
301-718-7868

Dated: November 19, 2013

# **ATTACHMENT**

EEOC Form 161 (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Matthew J. Ryan
5480 Wisconsin Ave
Apt. 615
Chevy Chase, MD 20815

From: Washington Field Office
131 M Street, N.E.
Suite 4NW02F
Washington, DC 20507

☐ On behalf of person(s) aggrieved whose identity is
CONFIDENTIAL (29 CFR §1601.7(a))

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 570-2013-01765 | Yofi D. Weinberg, Enforcement Supervisor | (202) 419-0756 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐  Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

Mindy E. Weinstein,
Acting Director

AUG 2 7 2013

(Date Mailed)

Enclosures(s)

cc:
Hr Director
HR Department
BUCKLEY SANDLER, LLP
1250 24th Street, N.W.
Washington, DC 20037

Enclosure with EEOC
Form 161 (11/09)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice.** Therefore, you should **keep a record of this date.** Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***